IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MOLLY G. JOHNSON,

        Plaintiff,

vs.                                      No. CIV 02-1311 LFG

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff  Molly G. Johnson ("Johnson") invokes this Court's jurisdiction under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner").  The Commissioner determined that Johnson was not eligible for Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") benefits.  Johnson moves this Court for an order reversing the Commissioner's final decision, or remanding for a rehearing [Doc. 7].  Both parties have consented to exercise of jurisdiction by a Magistrate Judge [Doc. 3].

## Background

Johnson was born on December 12, 1948 and was 53 years old at the time of the administrative hearing in this case.  She has an eleventh grade education[1] and previously worked as a sergeant at a county detention facility, as a truck driver, bus driver, and gas station attendant. Johnson filed her application for disability benefits on February 9, 2000, with a protective filing date

---

[1]The record is inconsistent with regard to Johnson's educational level.  *See*, Tr. 66, 136, 170, 201.  The ALJ found that Johnson has an eleventh grade education (Tr. 11), and this determination is supported by substantial evidence.

of December 29, 1999.  She alleges an onset date of February 7, 1999, the date she injured her back while at work at the detention facility.

On that date, Johnson and three other corrections officers were called to physically move an inmate who had wedged himself into a corner.  The prisoner resisted the attempts at extrication.  In the ensuing scuffle, Johnson was injured, either by being pushed up against a wall by the inmate (Tr. 90), or by falling to the ground with the inmate and having other guards fall on top of her  (Tr. 166-67), or both (Tr. 94).  She had immediate, significant lower back pain, and pain radiating down her right leg.  She was eventually diagnosed with a severely herniated disc at the L5-S1 level.  After failed attempts at conservative treatment, fusion surgery was performed in June 1999.  Although Johnson seemed initially to be improving after the surgery, she reports continuing severe low back and leg pain, which interferes with her sleep and causes her constant discomfort.  (Tr. 195-201).

Johnson's application was denied at the initial and reconsideration stages, and she sought timely review from an Administrative Law Judge ("ALJ").  An administrative hearing was held in Roswell, New Mexico on March 21, 2002.  Johnson was present and accompanied by her attorney.  In a decision dated May 9, 2002, the ALJ found that Johnson was not disabled within the meaning of the Social Security Act and denied the benefit request.  Johnson challenged this determination to the Appeals Council which, in turn, denied her request for review on September 6, 2002.  This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]

---

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2003); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are:  at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2003);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8]

---

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2003); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. §§ 404.1520(b), 416.920(b)(2003).

[5]20 C.F.R. §§ 404.1520(c), 416.920(c)(2003).

[6]20 C.F.R. §§ 404.1520(d), 416.920(d) (2003).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [him] from doing any gainful activity."  20 C.F.R. §§ 404.1525(a), 416.925(a) (2003).

[7]20 C.F.R. §§ 404.1520(e), 416.920(e) (2003).

[8]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2003).

age, education and past work experience, she  is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]  In the case at bar, the ALJ made the dispositive determination of non-disability at step five

of the sequential evaluation.

Johnson contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry her burden of proof, and that the Commissioner did not apply the correct legal standards.

<u>**Standard of Review and Allegations of Error**</u>

On appeal, the Court's review of the Commissioner's determination is limited.  <u>Hamilton v. Secretary of Health & Human Servs.</u>, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court does not consider the application *de novo*.  Rather, the Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  <u>Glenn v. Shalala</u>, 21 F.3d 983 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  <u>Trimiar v. Sullivan</u>, 966 F.2d 1326, 1329 (10th Cir. 1992); <u>Muse v. Sullivan</u>, 925 F.2d 785, 789 (5th Cir. 1991).  In <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

The record must demonstrate that the ALJ considered all of the

[9]20 C.F.R. §§ 404.1520(f), 416.920(f) (2003).

[10]<u>Muse v. Sullivan,</u> 925 F.2d 785, 789 (5th Cir. 1991).

> evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects. (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing the medical records and other evidence, the ALJ concluded that Johnson was not disabled under the standards of the Social Security Act. He found that her back injury and subsequent lumbar fusion constitute a severe impairment under the Social Security regulations,[11] but that this medically determinable impairment does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 14). He found that Johnson's allegations regarding her limitations were not totally credible, and he determined her RFC to be a restricted range of light work. He further found that Johnson is unable to return to her past relevant work, but that other work exists in significant numbers which she is capable of performing, given her RFC. (Tr. 15).

Johnson claims that the ALJ erred in: (1) determining that Johnson has the RFC to perform a restricted range of light work; (2) improperly assessing Johnson's credibility; and (3) finding that Johnson's spine disorder did not meet the "listings."

### Summary of Johnson's Medical Care and Conditions

Following her back injury, Johnson was seen by Dr. R.E. Smith in Lovington on February 8, 1999, the day after the incident. Dr. Smith noted that she was experiencing pain over the right

---

[11]The ALJ found that Johnson did not have a medically determinable severe mental impairment [Tr. 12], and she does not contest this finding.

buttock with sciatica down the right leg.  X-rays showed "arthritis" of the L5 vertebra, with the spine

"otherwise within normal limits."   At this point, Dr. Smith prescribed conservative treatment, and

stated that Johnson could return to work right away.  (Tr. 101).

However, Johnson's lower back pain continued, and when she returned to see Dr. Smith three

days later, on February 11, 1999, he noted she had no improvement in the lower back and still had

sciatica in the right leg.  He recommended that she discontinue work until the cause of her pain could

be determined.  (Tr. 100).  An MRI taken in Lovington on February 18, 1999 showed a severely

degenerated and herniated disc at level L5-S1 (Tr. 135).

On February 26, 1999, Johnson was seen by Dr. Mario Gutierrez, an orthopedist practicing

in Roswell.  (Tr. 167).  Johnson told him she'd had lower back pain since the injury on February 7,

radiating into her lower right leg.  The pain lasted all day and kept her awake at night, and it was

exacerbated by sitting, standing, and walking.  She also reported numbness, tingling and weakness

in the legs.  On examination, Dr. Gutierrez found her gait was normal, she could walk on heels and

tiptoes without weakness, her lower leg muscle strength was normal, her deep tendon reflexes were

normal,  and her straight leg raising tests were negative.   He noted that she had a possible decreased

pinprick sensation on the right leg at the S1 nerve root distribution.  He also found that her range of

motion was normal, but she had pain with motion in all directions.  (Tr. 90-91).

Dr. Gutierrez diagnosed Johnson with lower back pain and lumbar radiculopathy,

degenerative disc disease and a protruding disc at L5-S1.  He recommended conservative treatment,

stating that surgery was not warranted "for a one level HNP [herniated nucleus pulposus]."   His

assessment was that Johnson could not return to work while undergoing physical therapy, but that

she could start light duty or sedentary work "in a couple of weeks."  (Tr. 91).

6

On March 2, 1999, Johnson returned to Dr. Smith, stating that she was dissatisfied with Dr. Gutierrez's opinion. She was still having back pain, and the medication she had been taking for pain caused vomiting. Dr. Smith then referred her to Dr. Mark D'Alise, a neurosurgeon practicing in Lubbock, Texas. (Tr. 100).

Johnson first saw Dr. D'Alise on April 19, 1999. She noted on an intake form that she was experiencing pain in the back, hips, and legs, weakness and numbness of the legs, and difficulty sleeping. (Tr. 132). In addition, she told the doctor that her back pain radiated from the lumbosacral region through the right buttock and thigh to the calf and lateral ankle, and that it was exacerbated by standing and walking. She was having paresthesias[12] on the outside of her ankle, down to the top of the foot, and she noticed that her right foot had begun to drag when she walked. (Tr. 128).

On examination, Dr. D'Alise found that she has signs of L5 radiculopathy[13] with a "dermatomal" pattern to her pain (*i.e.*, spreading out along the nerve pathways[14]), and a partial foot drop with notable weakness of the right ankle. X-rays and an MRI scan showed a central disc herniation at L5-S1 with complete collapse of the disc space height at that level, as well as bilateral foraminal compromise[15] involving the L5 nerve roots. (Tr. 128-29). Although prescribing conservative treatment including medications and physical therapy, Dr. D'Alise noted that Johnson would "certainly" have to be considered a candidate for surgery. (Tr. 129).

---

[12]An abnormal sensation, such as burning or prickling. Dorland's Illustrated Medical Dictionary, 26th ed., at 970 (hereafter cited as "Dorland's").

[13]Disease of the nerve roots. Dorland's, at 1109.

[14]"Dermatome" means the area of skin supplied with afferent nerve fibers by a single posterior spinal root. Dorland's, at 362.

[15]*I.e.*, narrowing of the passage through a bone. Dorland's, at 517.

On April 21, 1999, Johnson reported back to Dr. Smith that Dr. D'Alise had recommended surgery, and he agreed with this assessment. (Tr. 99).

On May 24, 1999, Johnson returned to see Dr. D'Alise. He noted some improvements with the physical therapy, but no improvement in her radicular pain. She told the doctor that she could not perform simple activities such as shopping and washing dishes. She was very disappointed and wanted to discuss surgery. Dr. D'Alise recommended a bilateral discectomy with interbody fusion of the lumbar spine. (Tr. 127).

The surgery took place in Lubbock on June 17, 1999. At a pre-surgery examination on June 15, Dr. D'Alise found that Johnson still had a dermatomal pattern to her pain in the L5 distribution on the right. She still exhibited weakness in the right ankle, as well as in the muscle of the toe. (Tr. 95). On June 17, 1999, Dr. D'Alise performed a posterior lumbar fusion and disc excision and placement of spinal implants at L5-S1. His final diagnosis was a herniated lumbar disc with radiculopathy, and degenerative joint disease in the lumbar region. He reported that she tolerated the procedure well and did well postoperatively. She was discharged home on June 22. (Tr. 93, 96-97).

At a two-week postop visit on July 1, 1999, Johnson told Dr. D'Alise that she was doing very well. He confirmed this on examination and noted that she continued to progress as expected. He instructed her to increase her activity as tolerated. (Tr. 126). At her follow-up visit on August 10, 1999, x-rays showed that the spinal implants were in good position, and the vertebral bodies and disc space heights were maintained. Dr. D'Alise noted that "her severe radicular pain is gone at this point." He gave her a prescription for painkillers and instructed her to increase her activities slowly until the next visit. (Tr. 125, 134).

In August 1999, Johnson was terminated from her job with Lea County Detention Center.

(Tr. 168, 182).  In July and August of that year, Johnson was being seen at the Guidance Center of Lea County for counseling.  She told the counselor that ever since the incident at the detention center she had been having ongoing flashbacks and nightmares, and since the surgery, she is in continuing pain but can't take most pain medications due to allergies.  She stated she "fears" going back to work at the detention center, but she knows nothing else.  The counselor suggested that she contact the Department of Vocational Rehabilitation (DVR).  (Tr. 184).  On August 3, 1999, she reported to the counselor that she was very angry about losing her job, but said that even if the doctor released her to return to work, she does not think she could ever work in the jail again.  The counselor again recommended that she utilize the resources of the DVR, to begin developing a new career.  (Tr. 182).

On September 14, 1999, Johnson reported to Dr. Smith that she had been seeing a counselor who recommended she take antidepressants.  Dr. Smith noted that Johnson appeared to be angry rather than depressed.  She asked for a sedative instead of an antidepressant, to help her sleep through the pain.  (Tr. 99).  There is nothing on the record to indicate that Johnson returned to see Dr. Smith after this date.

At a post-surgery visit on October 5, 1999, Dr. D'Alise noted that Johnson's leg pain continued to improve, although she was still experiencing some "mechanical pain."  He recommended that she continue with physical therapy and stay out of work to fully recover.  (Tr. 124).

In November 1999, Johnson went to see Dr. Claude Gelinas, an orthopedic surgeon practicing in Albuquerque.  (Tr. 116-119, 138).  Dr. Gelinas has special training in spine surgery.  (Tr. 168).  Johnson was apparently referred to Dr. Gelinas by a New Mexico State agency (Tr. 168), but the

9

record is not clear as to why she was seeing both Dr. D'Alise and Dr. Gelinas at this time.[16]

At this initial visit to Dr. Gelinas, she reported that she had been experiencing significant amounts of pain in her back and leg since the June 1999 surgery.  She said she was taking 4 Lortabs per day[17], in addition to pain medication she had been taking prior to the surgery.  She stated she had recently started on pool therapy.  She also said she had an experience of "giving way" recently, but denied any "specific focal weakness," and stated she was able to walk for approximately 5 minutes, and to sit and stand for 10-15 minutes.  (Tr. 116-117).

On examination, Dr. Gelinas noted that Johnson exhibited normal reflexes, had a negative straight leg raising test, had no focal motor weakness, and no sensory changes.  He noted that Johnson was "right in the middle of her recovery."  He recommended a 2-3 month course of physical therapy, to include initial water therapy progressing to land-based strengthening.  He stated that if she continued to improve with conservative treatment and showed no signs of motion at the fusion site, he would expect that she would achieve maximum medical improvement within 9 to 12 months, at which time her impairment rating would be 10 percent, according to the AMA Guidelines, 4th ed. If she were still symptomatic after 9 months, and exhibited any motion at the fusion site, then another surgery could be considered.  (Tr. 117).

On January 3, 2000, Johnson told her physical therapist that she'd had at least four episodes of her right leg giving out over the past 4-6 weeks and that on one occasion she fell face-first into a

---

[16]She told an independent medical examiner, to whom she was referred in March 2001, that she did not know which of these two doctors was her official physician.  (Tr. 169, 171, 177).  At that time, she was still seeing Dr. D'Alise infrequently, and had not returned to see Dr. Gelinas.

[17]Lortab is a narcotic painkiller and can be habit-forming.  Physicians' Desk Reference, 53d ed., at 3162-63.

recliner.  She stated she was unable to sit and had to lean in order to keep the pressure off her central

lower back.  The therapist noted that Johnson was improving but that she was also reporting new

symptoms that needed further medical workup.  (Tr. 102-03).

On January 25, 2000, Johnson returned to see Dr. D'Alise for a 7-month follow-up check.

He noted that Johnson still experienced lumbosacral junction pain and upper buttock muscle pain, but

her leg symptoms were absent.  He noted that she had better mobility and was doing better getting

in and out of her chair.  He encouraged her to continue with her aquatics therapy and gave her some

alternative pain medication.  (Tr. 123).

Johnson applied for Social Security disability benefits in February 2000.  At a face-to-face

interview on February 10, the interviewer noted that Johnson had difficulty sitting, standing and

walking.  She told the interview that she hated being in pain all the time and hated not being able to

work.  (Tr. 71).  On February 18, 2000, she was given a RFC examination by Dr. Donald Stewart.

He noted that she had sustained a herniated nucleus pulposus and had undergone fusion surgery.  He

noted exertional limitations, including the ability to lift 20 pounds occasionally and 10 pounds

frequently, and a limitation in standing and walking of 6 hours in an 8-hour day.  Dr. Stewart stated

that Johnson had not yet reached maximum medical improvement and had been set up for "vigorous

physical therapy."   X-rays would be evaluated at 9-12 months post-surgery, to determine whether

any movement was present (which would indicate that the fusion surgery was unsuccessful).  (Tr.

104-108).

Johnson returned to see Dr. Gelinas on March 10, 2000.  He noted that she was still having

back pain but her leg pain had improved.  X-rays taken that day showed no gross motion occurring

at the fusion site.  He felt it was reasonable at this point to continue with the physical therapy

program for 4-6 more weeks, which should include pool therapy.  He also told Johnson that she should try to wean herself off the narcotic pain medication.  He told her to return in 3 months and noted that, if there were not evidence of motion on x-rays at that time, she would be at maximum medical improvement and should be able to return to light duty work.  (Tr. 113).

On April 18, 2000, Johnson returned to see Dr. D'Alise.  He wrote that he was pleased with her progress in that her activity level was slowing improving and she did not appear to have "plateaued" yet.  He told Johnson that, possibly by summer, he might allow her to start riding horses again.  (Tr. 121).  On July 11, 2000 at another follow-up visit, Johnson reported to Dr. D'Alise that, while her activities were slowing increasing and she did sense some improvement over her pre-surgery state, she is disappointed that she has never returned to her pre-injury state.  Dr. D'Alise told her this is a common problem following a back injury, and he encouraged her to work on her activity level.  He noted that Johnson was exercising regularly and had started to very gently ride her horses.  (Tr. 159).

Johnson returned to see Dr. Gelinas on August 15, 2000.  He noted that, although she did report improvement in leg pain, she had no improvement at all with regard to her back pain and was still taking 4-6 Lortab per day.  He took "bending films" that date, and reported that the films showed motion at the L5-S1 level (which would indicate a failure of the fusion surgery).  Dr. Gelinas told Johnson that she had a nonunion in her back.  He had a long talk with her about her options, which were either to wait and see if her back would improve over time, or else to proceed with another fusion surgery.  He said there was still hope that she could get some improvement, if a solid fusion is obtained.  He noted that, if Johnson elected not to proceed with surgery, then she is at maximum medical improvement and he would give her an impairment rating of 10 percent, with a "sedentary

light duty work restriction." (Tr. 146).   There is no record of Johnson having returned to see Dr. Gelinas after this visit.

When Johnson returned to see Dr. D'Alise on August 22, 2000, she reported that the orthopedical consultant in Albuquerque told her that her fusion had not "taken."   Dr. D'Alise disagreed with this assessment.   He reviewed Johnson's chart, noted that her activity level had improved from her preoperative state, and stated that he was holding to his opinion that her recovery was within normal limits.   He sent her for flexion/extension lumbar x-rays that date to verify if there was any movement, which would be the only justification for another surgical procedure.[18] (Tr. 158-59).   A later medical report states that the radiologist noted no instability of any level, although Johnson did exhibit limited flexion.  (Tr. 169).

Johnson saw Dr. D'Alise again on October 31, 2000.  He noted that she continued to slowly improve and was "getting around fairly well" but still had considerable limitations and should continue to be kept out of work for at least the next three months.  (Tr. 157).

On March 22, 2001, Johnson was sent for an independent medical evaluation by Dr. Thomas Grace.  Dr. Grace examined Johnson and reviewed her medical records.  Johnson reported to Dr. Grace that she still had pain in her back and left buttock, with an area of numbness and burning also in the left buttock.  She reported a significant problem in sleeping through the night due to pain in the right buttock and said she took narcotic medication every night for sleep, and occasionally during the day, that activity tended to aggravate the pain, and that she had trouble sitting in one spot for long periods. (Tr. 170-171).  Johnson also told Dr. Grace that, although she had definitely improved since

---

[18]There are no radiological reports on the record for any films taken on August 22, 2000, nor for the films taken on August 15, as described by Dr. Gelinas, which reportedly showed movement at the fusion site.

the surgery, she did not feel she had made much progress since the fall of 1999. She rated her pain on the day of the examination as moderate, or about midpoint between no pain and unbearable pain. She told him she was not a good candidate for further surgery, because she did not want to go through the ordeal again. (Tr. 171).

On examination, Dr. Grace noted that Johnson stood with a normal posture and could walk without significant impediment. He stated that she sat through most of the history and examination without any noticeable problem, although she did get up infrequently. She had a slight restriction in motion of her back and used support when she went through the range of motion test. She could walk on toes and heels "with coaxing." Dr. Grace tested her reflexes and noted an intact neuromotor function. He noted a "mildly positive straight leg raising maneuver" in both sitting and supine positions. (Tr. 171-72). Dr. Grace tested Johnson for "illness behavior" using "Waddell signs." He found a slightly positive reading on one of the tests, which he considered insignificant. (Tr. 172-73).

Dr. Grace noted the conflict of opinion between Drs. Gelinas and D'Alise on the issue of post-surgery motion at the surgical site. After reviewing Dr. D'Alise's x-ray films of August 22, 2000 (he was not given Dr. Gelinas' films of August 15, 2000), he could find no evidence of motion between the L5-S1 levels on either flexion or extension, and while he could not definitely confirm bony union, his opinion was that there is no evidence of instability between those two levels. (Tr. 173-74). His overall impression was that Johnson was has lumbar disc disease at L5-S1, with radiculopathy, as a result of the February 6, 1999 trauma. (Tr. 174).

Johnson clearly states that she is not willing to undergo further surgery. (Tr. 171, 199). Given this position, Dr. Grace stated that her chances for any significant future improvement were small, and his opinion was that Johnson had already reached a point of maximum medical

14

improvement, and that this occurred about one year after her surgery, in August 2000.  (Tr. 174-75).

His recommendation for her remaining course was to treat the symptoms and continue with her home

exercise program, along with anti-inflammatory and sleep medications on a relatively frequent basis.

His opinion was that Johnson should return to work of a sedentary nature.  (Tr. 176).

At the examination, Dr. Grace asked Johnson about her ability to do or not do certain

activities and says that she could not give a firm answer.  He stated that he noticed in the office that

she could sit without noticeable discomfort for 20-30 minutes at a time.  He also said that he

reviewed her video surveillance, particularly on January 12, 2000, and noticed that she was able to

sit, stand or walk over a period of approximately 5 hours.[19]  He gave Johnson an impairment rating

of 10 or 20 percent, depending on which edition of the AMA Guidelines is used.  (Tr. 176).

There are no further medical reports after this date on the record.

### Discussion

Johnson claims that the ALJ erred in:  (1) determining that Johnson has the RFC to perform

a restricted range of light work; (2) improperly assessing Johnson's credibility; and (3) finding that

Johnson's spine disorder did not meet the "listings."

A.  The Listings

At step three, the ALJ found that Johnson's back disorder does not meet the requirements for

*per se* disability under Listing 1.04A, in that her "spinal injury is not documented to result in a

compromise of the spinal cord, a nerve root, or induced arachnoiditis or stenosis as required under

section 1.04."  (Tr. 12).  Johnson challenges this finding, contending that her documented symptoms

---

[19]References to "video surveillance" appear in the doctor's records and reports.  *See, e.g.,* Tr. 176.
However, surveillance tapes are not part of the administrative record and it is unclear why and by whom tapes
were made.

and physical findings do fulfill the requirements of section 1.04A.

To show that an impairment matches a listing, the impairment must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  Sullivan v. Zebley, 493 U. S. 521, 530, 110 S. Ct. 885 (1990).  Meaningful judicial review requires that the ALJ "discuss the evidence and explain why he found that appellant was not disabled at step three," rather than merely state a summary conclusion.  Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).

Section 1.04A describes the eligible impairment as follows:

> 1.04  *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and, if there is involvement in the lower back, positive straight-leg raising test (sitting and supine); or
>
> B.  Spinal arachnoiditis . . .;  or
>
> C.  Lumbar spinal stenosis . .

Thus, Listing 1.04A requires that the claimant have:  (1) a disorder of the spine, as defined therein; and (2) the disorder must result in compromise of a nerve root or the spinal cord; and (3) there must also be evidence of nerve root compression characterized by the following four symptoms: (a) neuro-anatomic distribution of pain, (b) limitation of motion of the spine, (c) motor loss (*i.e.*, atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and (d) if there is involvement in the lower back, positive straight-leg raising test (sitting and supine).

If Johnson can establish these elements, she meets the listing for 1.04A.[20]  If there is a failure to document any part of the listing, the claimant cannot be found *per se* disabled at step three.

    1.  <u>Establishment of "Disorder of the Spine" Resulting in Compromise of the Nerve Root</u>

    Johnson has documented that the first two of the three criteria noted above, in that she has shown through medical evidence that she has a "disorder of the spine" in the form of a herniated nucleus pulposus, or degenerative disc disease, and that this disorder results in compromise of a nerve root.

    An MRI taken February 18, 1999 shows a severely degenerated and herniated disc at L5-S1. (Tr. 135).  Dr. Gutierrez's examination of Johnson on February 26, 1999 notes that radiologic tests, including an MRI and lumbar x-rays show a herniated disc at the L5-S1 level, and also reveal degenerative disc disease at that level, with collapsing and osteophyte formation.  (Tr. 91).  He also mentions that she has a "one level HNP," or herniated nucleus pulposus.  Dr. D'Alise, in his history, physical exam, and operative report of June 1999, states his diagnosis of Johnson's condition as a herniated lumbar disc with radiculopathy, as well as degenerative joint disease in the lumbar region. (Tr. 93).  He noted that the MRI revealed a central disk herniation at L5-S1, with complete collapse of the disk space height.  (Tr. 95).  In February 2000, Dr. Stewart, who examined Johnson for an RFC assessment, also noted that she had sustained a herniated nucleus pulposus.  (Tr. 105).

    The record also demonstrates that Johnson's spinal condition caused and continues to cause compromise of the nerve root.  On April 19, 1999, Dr. D'Alise noted MRI and x-ray results  showing a "marked bilateral foraminal compromise involving the L5 nerve roots at that level."  (Tr. 128).

---

[20]And there would thus be no need to inquire  into arachnoiditis or stenosis, as set forth in subsections B and C.   In any case, Johnson does not contend that she meets the requirements for those subsections, so the Court makes no comment on the ALJ's finding that Johnson has not shown arachnoiditis or stenosis.

"Foraminal" refers to the foramen, or passage into or through a bone.[21]   And, as noted above, he diagnosed Johnson in April and June 1999 as suffering from, among other things, "radiculopathy" at L5 which, as noted above, means disease of the nerve root.  (Tr. 93, 96, 128).      T h i s  r e c o r d demonstrates that Johnson had a herniated nucleus pulposus and degenerative disc disease prior to the June 1999 surgery, and that this condition impinged on her nerve root.  Although the surgery initially seemed to provide some relief from her symptoms, the record indicates that Johnson has never returned to normal functioning and has continued to experience pain and loss of function even after the surgery; however, as noted above, there is a conflict of opinion between two of Johnson's doctors as to whether the surgery was successful.

In his independent medical evaluation done on March 20, 2001, Dr. Grace noted these conflicting medical opinions (Tr. 168-69, 173-74).  His conclusion was that there was no instability, and that the surgery had therefore been successful in the sense that the fusion had "taken."  However, he also diagnosed Johnson's condition on that date as lumbar disc disease with radiculopathy which, as noted above, means disease of the nerve root.  (Tr. 174).  This was a year and 9 months after the surgery.

The record clearly establishes a herniated nucleus pulposus and degenerative disc disease prior to the June 1999 surgery.  It also clearly establishes continued degenerative disc disease, with involvement of the nerve root, after that date.  Whether or not the fusion "took," the medical evidence demonstrates that, a year and 9 months after the surgery, Johnson was still suffering from degenerative disc disease, with nerve root impingement.

The occurrence of the surgery, therefore, does not preclude a finding that Johnson continued

---

[21]Dorland's, at 517.

18

to suffer postoperatively from a "disease of the spine," as defined in the Listing.  *See*, Frazier v. Apfel, 221 F.3d 1351 (Table, text in Westlaw), No. 99-3367, 2000 WL 966567, at *5 n.4 (10th Cir. July 13, 2000) (unsuccessful prior surgical treatment does not take the claimant out of the listing for spine disorders; "It appears that the ALJ proceeded on an erroneous assumption that, once a herniated disc has been removed, an individual cannot meet listing 1.05C [the predecessor to 1.04] because the disc is no longer herniated").  *See also* the Listings, at 1.99(I)(1): "medical treatment (including surgical treatment) must be considered in terms of its effectiveness in ameliorating the signs, symptoms, and laboratory abnormalities of the disorder . . ."

The Court finds substantial evidence on the record to demonstrate that Johnson's condition fulfills the threshold requirement of Listing 1.04 that the Claimant have a "disorder of the spine" in the form of herniated nucleus pulposus or degenerative disc disease, "resulting in compromise of a nerve root."

### 2.   Establishment of Specific Symptoms of Nerve Root Compression

Johnson also has the burden of showing specific medical evidence of nerve root compression characterized by (a) neuro-anatomic distribution of pain, (b) limitation of motion of the spine, (c) motor loss (*i.e.*, atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and (d) positive straight-leg raising test (sitting and supine).  The Court finds substantial medical evidence of two of these symptoms in the record, both before and after the June 1999 surgery; however, there is insufficient evidence as to the requirements regarding limitation of motion and positive straight-leg raising test.

The record supports a finding that Johnson has experienced neuro-anatomic distribution of pain in the entire period since the incident.  On February 8, 1999, the day after the incident, Johnson

was examined by Dr. Smith, who noted an "objective finding" that she was experiencing pain over the right buttock, with sciatica in the right leg. (Tr. 101). "Sciatica" is a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity, most commonly caused by a prolapse of the intervertebral disc.[22]

In April 1999, Dr. D'Alise noted that Johnson had pain in the lumbosacral region, which radiated through the right buttock and thigh to the calf and lateral ankle. (Tr. 128). He noted also that there was a "dermatomal pattern to her pain which is in the L5 distribution on the right." (Id.). He made the same findings in June 1999, at the time of the surgery. (Tr. 94, 95). In March 2001, Dr. Grace noted the Johnson was experiencing pain in her back and left buttock, with a burning sensation and numbness in the left buttock which "comes and goes" but extends down the posterior aspect of the left thigh, sometimes down to the left calf. (Tr. 170).

Johnson has also demonstrated that she has sustained "motor loss," which can be shown by atrophy or muscle weakness, accompanied by sensory or reflex loss. In April 1999, Dr. D'Alise noted that Johnson was experiencing right leg and ankle weakness, with paresthesia in the lateral ankle and onto the top of the foot. (Tr. 128) Johnson also stated on an intake sheet for that visit that she was experiencing weakness and numbness in the legs. (Tr. 132). Johnson reported to Dr. D'Alise that she was dragging her right foot when she walked, and he found on examination that she had a partial foot drop, with a 3 over 5 weakness of the right ankle. (Tr. 128).

In May 1999, Dr. D'Alise noted that her ankle weakness had slightly improved but was still present. (Tr. 127). In June 1999, he again noted the symptoms of right leg and ankle weakness with paresthesia in the ankle and foot, and he also found weakness in the extensor hallucis longus (the long

---

[22]Dorland's, at 1178.

muscle of the big toe[23]).  (Tr. 94-95).  In November 1999, Dr. D'Alise reported that Johnson had improved since the surgery.  Although her leg pain had improved, she still had some numbness and tingling, specifically number over her entire right leg.   His findings included "no focal motor weakness," although he notes she "had an incident of giving-way recently, but denies any specific focal weakness."  (Tr. 116-17, 162).

On January 3, 2000, Johnson reported to her physical therapist that she had at least four episodes of her right leg "giving out" over the preceding 4 to 6 weeks, to the extent that on one occasion she fell face-first into a recliner.  (Tr. 102).  In March 2001, she was found to have numbness in the left buttock which extended down the left leg, sometimes down to the calf.  (Tr. 170).  The evidence of reflex loss is scanty (*see*, Tr. 91, 117, 172), but the Listing requires only sensory or reflex loss, not both.

Johnson has not shown, however, that she has suffered "limitation of motion of the spine," nor that she has had positive straight leg raising tests, throughout the relevant period.

On February 26, 1999, Dr. Gutierrez examined Johnson and found that, although she had pain with motion in all directions, she could achieve a normal range of motion.  (Tr. 91). In March 2001, Dr. Grace noted that Johnson had a slight restriction of motion in her back, and used support when she went through her motions.  (Tr. 171).  He also noted that an x-ray taken in August 2000 showed limited flexion.  (Tr. 169, 174).  This might conceivably be enough to satisfy the Listing.  However, the Court need not make this determination, because Johnson has not met the final requirement, that she have positive straight leg raising ("SLR") tests, sitting and supine.

Dr. Grace did note a positive SLR result in March 2001.  At one point, he describes it as a

---

[23]Dorland's, at 845.

"mildly positive straight leg raising maneuver, particularly on the right-hand side," and later, "a positive straight leg raising maneuver for . . . her back." (Tr. 172). However, earlier tests, one performed in February 1999 shortly after the injury (Tr. 91), and another done in November 1999, a few months after the fusion surgery (Tr. 116), showed negative results. The single test result in March 2001 does not fulfill the requirement that an impairment as defined in the Listings "has lasted or is expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1525(a).

The Court finds that the record supports the ALJ's conclusion that Johnson fails to meet the Listing for a disorder of the spine under 1.04A. Although Johnson's condition comes very close to meeting the 1.04A requirements, she has not met her burden of demonstrating that she fulfills every one of the specified medical criteria, and if any one item has not been established, there can be no finding of *per se* disability at step three. Sullivan v. Zebley, *supra*.

The Court notes, however, that the ALJ's step three determination is stated in almost conclusory fashion, as follows: "[Johnson's back injury] is 'severe' within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Ms. Johnson's spinal injury is not documented to result in a compromise of the spinal cord, a nerve root, or induced arachnoiditis or stenosis as required under section 1.04."

This short statement falls somewhat short of the admonition of Clifton v. Chater, *supra*, that meaningful judicial review requires that an ALJ "discuss the evidence or his reasons for determining that appellant was not disabled at step three." Id., at 1009.

B. Credibility Determination

Johnson also challenges the ALJ's credibility assessment. The ALJ found that Johnson's

22

statements, that she is in constant pain which severely restricts her daily activities, are not supported by the evidence, in part because he did not find her testimony entirely credible.  He wrote, "[a]s to Ms. Johnson's pain complaints, I find no such reports to her treating sources which would be a reasonable response to such intractable discomfort," and that he found "the claimant's allegations regarding her limitations are not totally credible . . .."  (Tr. 13, 15).

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." Kepler v. Chater, 68 F. 3d 387, 391 (10th Cir. 1995) (internal citation omitted). Nonetheless, credibility findings must be closely and affirmatively linked to substantial evidence and not merely conclusory. Id. A formalistic factor-by-factor recitation of the evidence is unnecessary. As long as the ALJ provides specific evidence upon which he relies to support his credibility findings, he complies with the dictates of Kepler.  Qualls v. Apfel, 206 F. 3d 1368, 1372 (10th Cir. 2000).

With respect to allegations of pain, a claimant's testimony alone cannot establish the existence of disabling pain. Talley v. Sullivan, 908 F. 2d 585, 587 (10th Cir. 1990).

> A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment, that could reasonably be expected to produce the alleged disabling pain.

Thompson v. Sullivan, 987 F. 2d 1482, 1488 (10th Cir. 1993) (internal citations omitted). The framework used for proper analysis of a claimants evidence of pain consists of the following elements:

> (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective

> allegations of pain; and (3) if so, whether, considering all the evidence,
> both objective and subjective, claimant's pain is in fact disabling.

Luna v. Bowen, 834 F. 2d 161, 163-64 (10th Cir. 1987).

To find Johnson's pain disabling, there must be medical evidence showing that the pain is "so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment."  Brown v. Bowen, 801 F. 2d 361, 362-63 (10th Cir. 1986) (internal quotation omitted). Other factors pertinent to the ALJ's credibility determinations are: "a claimant's persistent attempts to find relief for [her] pain and [her] willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor . . ., the claimant's daily activities, and the dosage, effectiveness, and side effects of medication."  Luna, 834 F. 2d at 165-66.

Johnson's own statements about her pain include the following.  In an undated questionnaire, probably filled out at time she applied for benefits in February 2000, Johnson stated that she lived alone, typically got up early and fixed breakfast for herself.  She walked daily for about 10 minutes and went to water therapy three times a week.  She was able to take care of her own bathing and dressing needs.  In addition, she cleaned the house with the help of her teenage grandson and daughter, although she did not bend or stoop and had to do everything slowly.  She drove a car and did her own shopping, although her grandson helped with unloading.  (Tr. 73-78).

By April 27, 2000, Johnson reported that her pain was getting worse, and she could no longer do housework or pick up her three-year-old grandchild.  She could not bend over, stoop, or lift over 5 pounds.  She could not vacuum, and her daughters have to help her do the things she can no longer do.  She reported that her husband had to put her shoes on for her, because she cannot bend or lift her leg. (Tr. 79, 83).

Prior to her back injury, one of Johnson's hobbies had been riding and training horses. She reported to Dr. D'Alise on July 11, 2000, about a year after the surgery, that she was exercising regularly and starting to very gently ride her horses. (Tr. 159). However, at the administrative hearing in March 2002, Johnson stated that she had tried riding horses again in March 2000, but she gave it up because there was too much pressure on her back, she could not throw her leg over the saddle, and it was too painful to ride. (Tr. 194-95).

At the March 2002 hearing before the ALJ, Johnson reported that she had constant pain, day and night. She said that she could not focus on television or reading, could sit for only 30 minutes at a time, had to constantly move around to get comfortable, and couldn't sleep for more than 2 hours at a time. She could no longer lift a 10-cup coffee pot or a gallon of milk. She said that she and her husband share the cooking and laundry duties, but he does the heavier work, and her daughter comes in to help her with housecleaning. (Tr. 195-201).

She also testified at the hearing that her life has been a "nightmare" from the date of the injury, and that "[i]t has taken my whole life . . . Everything I ever did was physical." (Tr. 195). One of her hobbies used to be horseback riding, and she says she can no longer get on a horse because of the pain, and because "I'm so afraid of being hurt."   (Id.). She also told a counselor in August 1999, shortly after the fusion surgery, that she "feared" going back to work at the detention center but knows nothing else. (Tr. 184).

In ruling that Johnson's pain allegations were not entirely credible, the ALJ found that Johnson's statements to the physicians who treated and examined her do not reflect the degree of disabling pain that she alleges. This conclusion finds support in the record.

The medical record indicates that, after the June 1999 surgery, Johnson initially reported to

Dr. D'Alise that she was improving.  (Tr. 124, 125-126, 134).  However, in November 1999, she saw Dr. Gelinas for the first time and told him that she was still experiencing significant lower back and leg pain.  He found, though, that she was improving and he expected continued improvement.  (Tr. 116-119).  In January 2000, Dr. D'Alise noted that she still had some back  pain but no leg pain at all, and she was continuing to improve.  (Tr. 123).  More improvement was noted in a March 2000 visit to Dr. Gelinas and an April 2000 visit to Dr. D'Alise.  (Tr. 113, 121).  Johnson did tell Dr. D'Alise in July 2000 that, although her activity level was slowly increasing and she'd had some improvement, she was disappointed that she'd never returned to her pre-injury state.  Dr. D'Alise told her this was a common problem after back surgery.  (Tr. 159).

It was at a return visit to Dr. Gelinas in August 2000 that Johnson reported continued back pain, and Dr. Gelinas took the x-rays which seemed to show a non-fusion.  (Tr. 146).  However, that same month, Dr. D'Alise saw her again and held to his opinion that her recovery was within normal limits. (Tr. 158-59).  In October 2000, Dr. D'Alise noted that Johnson continued to slowly improve, although she still had a period of recovery to get through. (Tr. 157).  At the March 2001 examination by Dr. Grace, Johnson did tell the doctor that she had a significant problem sleeping through the night and trouble sitting in one spot for long periods.  However, she self-rated her pain on that date at a "moderate" level.  (Tr. 170-71).

There is no indication in the record that Johnson told any of her treating physicians that she was in unbearable pain.  She clearly has had some pain since the accident, and this pain has never entirely cleared up, even after the fusion surgery.  However, the ALJ is correct that Johnson's statements to her doctors do not correspond to the degree of pain alleged at the hearing.  At most, Johnson expressed to her treating physicians dismay and dissatisfaction that she never returned to her

26

pre-injury state.  The record does demonstrate that Johnson is sincerely unhappy that she can no longer perform the physical work that she used to be able to do.  In addition, Dr. Grace found no evidence of "illness behavior," that is, exaggeration of symptoms.  Nevertheless, there is nothing on the record to disturb the ALJ's credibility finding.

C.  <u>RFC Finding and VE Testimony</u>

Finally, Johnson challenges the ALJ's finding that she has the RFC to perform light work, restricted by the requirement of a sit/stand option and only occasional postural movements. (Tr. 13, 15).  Johnson contends that it was error to propose a hypothetical to the VE incorporating this finding, as the record shows that she is capable of working only at a sedentary level.

"Sedentary" and "light" work are defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one  which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(a-b), 404.967(a-b) (2003).

Johnson contends that "Drs. D'Alise, Gelinas and Grace <u>all</u> agree that Plaintiff's final RFC is sedentary" in 2001.  This is not entirely accurate.

Dr. D'Alise, one of Johnson's treating physicians, filled out a Workers' Compensation form

on July 2, 2001, in which he gave his opinion that Johnson can lift up to 20 pounds occasionally or up to 10 pounds frequently, and can either walk or stand to a significant degree, or sit most of the time with a degree of pushing and pulling arm and leg controls.  He added a handwritten note which restricts Johnson to sitting or walking no more than 2 to 4 hours at a time, and performing pushing/pulling operations "as tolerated."  (Tr. 153-54).  This description falls within the definition of a restricted range of light work.

Dr. Grace, the independent medical examiner, wrote in his March 22, 2001 report that Johnson "could consider returning back to work of a sedentary nature."  (Tr. 176).  However, he added, "It is also clear to me, on reviewing her video surveillance, particularly on 1/12/00, that she was able to sit, stand, or walk over a period of approximately five hours between 11 in the morning and 4 in the afternoon."  (Id.).  The ALJ cited this statement as persuasive in his conclusion that Johnson can perform light work, with some restrictions.

Dr. Gelinas, on the other hand, did fill out a Workers' Compensation form on February 15, 2001 in which he checked off items indicating that Johnson is incapable of performing at even a sedentary level. (Tr. 151-52). However, he had filled out a similar form on November 10, 2000, in which he found that she could perform at a sedentary level (Tr. 149-50).  At the time he filled out both forms, he noted he had last seen Johnson on August 15, 2000, so there was no intervening physical examination that could account for the change in his opinion.  In any event, there is some evidence on the record, from a treating physician, that Johnson was limited to sedentary work.

The ALJ chose to accept other evidence that Johnson is indeed capable of performing light work, with certain restrictions, and the Court cannot say that this finding is not supported by substantial evidence.  The responsibility for determining RFC rests with the ALJ, not with any one

physician, 20 C.F.R. § 404.1546, and it must be based on the totality of the evidence.  20 C.F.R. § 404.1545; Soc. Sec. Ruling 96-5p.  The ALJ was not required to accept Dr. Gelinas' opinion, especially given the fact that it conflicted with the opinion of other treating and examining physicians, and even conflicted with Dr. Gelinas' own earlier opinion.  Tillery v. Schweiker, 713 F.2d 601, 603 (10th Cir. 1983).  In addition, the ALJ could reasonably reject Dr. Gelinas' opinion, as the doctor's own treatment records do not support his conclusion that Johnson could perform at only a sedentary, or less than sedentary, level.  Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994).

Dr. Gelinas noted in November 1999 that Johnson had normal reflexes, negative straight leg raising test, no focal motor weakness, and no abnormal sensory symptoms, although she was experiencing significant pain in the back and lower leg.  He noted that she was able to walk for only about 5 minutes, and to sit and stand for 10-15 minutes.  (Tr. 116-117).  On March 10, 2000, Dr. Gelinas noted that Johnson's leg pain had improved, but she still had back pain.  X-rays showed no gross motion at the fusion site, and Dr. Gelinas told Johnson that, if x-rays continued to show solid fusion in 3 months' time, she should be able to return to light duty work.  (Tr. 113).  By August 15, 2000, Johnson's leg pain continued to improve, but she had no improvement at all with her back pain, and Dr. Gelinas felt her x-rays showed motion at the surgery site.  He told Johnson that if she elected not to have surgery, then he would consider her to be at maximum medical improvement and could work with a "sedentary light duty work restriction."  (Tr. 146).  He stated on the Workers' Compensation form of November 10, 2000 that Johnson could do "sedentary work light duty," or "sedentary light duty restriction."  (Tr. 149-50).  As noted above, Dr. Gelinas changed this opinion to a less-than-sedentary rating as of February 15, 2001, but he had not seen Johnson in the

intervening three months, and there is no explanation on the record for this change in his opinion.

There is sufficient other evidence on the record to support the ALJ's finding that Johnson has the RFC for a restricted range of light work, including Dr. D'Alise's observations of Johnson's capabilities, which place her within a restricted range of light work, and Dr. Grace's report that he observed Johnson on video sitting, standing, and walking over a period of five hours. The hypothetical which the ALJ posed to the VE took account of this evidence. He asked the VE to assume a 53-year-old individual with a high school education, who could lift and carry 20 pounds occasionally and 10 pounds frequently, and who could occasionally climb, balance, stoop, kneel, crouch, and crawl. He added a further restriction that the individual could only sit or stand a maximum of 30 minutes at a time. With this hypothetical, the VE found that the individual described could perform the jobs of general office clerk, file clerk or record clerk, and sedentary cashier. When the ALJ added the restriction that the individual missed more than two or three days of work or had to take unscheduled breaks due to pain, the VE said there were no positions that would allow this. (Tr. 204-208).

The VE testified that Johnson has transferable skills from her past work as a supervisor, and from her experience using a computer to write reports. (Tr. 206). However, the VE also testified that Johnson's prior job as a sergeant in a corrections facility would have been at a skilled level and her other previous work was at a semi-skilled level, but the three positions listed by the VE as available to Johnson – general office clerk, file or record clerk, and sedentary cashier – are classified as unskilled. (Tr. 209-210). Plaintiff argues that the ALJ erred in accepting this testimony, as a person with a background in skilled work is not considered to have transferable skills, if the only work available to her are unskilled positions.

Plaintiff is correct that Johnson had no "transferable" skills from her previous employment to work at an unskilled level. The regulations require that "skills are considered transferable only when they 'can be used to meet the requirements of skilled or semi-skilled work activities of other jobs . . .." Dollar v. Bowen, 821 F.2d 530, 536 (10th Cir. 1987), *quoting from* 20 C.F.R. § 404.1568(d)(1). If the work activities of the "other jobs" are unskilled only, then a skilled or semi-skilled worker is considered to have no "transferable" skills.

This does not change the ALJ's ultimate result, however. In Dollar v. Bowen, the claimant was functionally illiterate and the determination that he had no transferable skills put him within the Grids definition of disabled, given his other characteristics. Johnson argues that she, too, should be considered disabled within the Grids definition because, if one assumes she has no transferable skills, she falls with Grids Section 201.01. But this result assumes that Johnson can perform only sedentary work, and the Court finds that the ALJ's conclusion of an RFC for a restricted range of light work is supported by substantial evidence. In addition, Johnson was not at the time of the hearing, and is not today, in the category of "advanced age" (55 or older); thus, she cannot take advantage of the rule that "it is not enough that persons of advanced age are capable of doing unskilled work; to be not disabled, they must have acquired skills from their past work that are transferable to skilled or semiskilled work." Terry v. Sullivan, 903 F.2d 1273, (9th Cir. 1990).

Johnson clearly suffers from pain and has restrictions in her daily life, and the Court is not unsympathetic to these facts. She comes close to meeting the requirements for benefits under the Act, but taking the record as a whole, the Court concludes that the ALJ did not err in finding that Johnson does not fall within the legal definition of "disabled."

31

## **Order**

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse or Remand [Doc. 7] is

denied, and the case is dismissed.

_Lorenzo F. Garcia_

Lorenzo F. Garcia
Chief United States Magistrate Judge